Services, LLC. Good morning. May it please the Court, my name is Chris Carter and I'm here representing Mercury. The District Court's decision used a tax return that the Corps was entitled to receive independent of any provision of the merger agreement and used that tax return to largely eliminate a specifically negotiated benefit that Mercury was entitled to receive under the party's December 2001 merger agreement. The benefit that was eliminated was the Section 10.01 payment, which required SRS to pay Mercury an amount equal to the economic benefit of tax deductions that were applied by Corps before the party's December 2011 merger closing. What exactly do you mean by the economic benefit? You seem to distinguish between an economic benefit and the benefit of the tax refunds themselves, the overpayments, which your client did in fact get. Correct, Your Honor. But that's a benefit, but you accord different significance to what you call an economic benefit. What do you mean by that? I use the term economic benefit, Your Honor, to quantify what the 10.01 payment should be. Simply stated, the Section 10.01 payment with respect to taxes is the difference between the amount owed without applying the 10.05 deductions. So it's really an artifact. I mean, it's not really an indemnification for actual tax loss. It's a device to recapture some other economic benefit. Is that what you're arguing? That is exactly correct, Your Honor. In a moment in our brief, we describe other courts that have recognized that indemnity provisions like this are, excuse me, in your words, an artifact. They're not a true indemnity. They're not limited to a true indemnity. What they accomplish is a way for the parties to handle a shifting of the value of tax deductions. Before the closing, the value, the dollar value of those deductions could not be known. And in this case and in other cases that we've described in our brief, the indemnity structure in the merger agreement is used as the vehicle in which that financial dollar value of the deductions is transferred, conveyed to Mercury. And it very clearly in this case constitutes a purchase price adjustment because the dollar value, what we refer to generally as the economic benefit of those 10.05 deductions, which there's no dispute they were 2.4 million. What you're describing now is a course of dealing, the nature of the negotiations between the parties, what the parties were trying to accomplish. But how is your position captured by the plain meaning of the contract language? Because Judge Stearns took the view that your position was not captured by the plain meaning of the contract. So explain to me how that plain meaning captures this. I'm going to answer your question, but I think it's an important point in terms of the artifact question you had, Your Honor. The economic benefit, the $2.4 million is to be paid from the escrowed purchase price. So in a very real and actual sense in this case, 10.01 affects a purchase price adjustment. There is nothing in Section 10.01 or Section 10.01 states the 10.01 payment shall be offset or reduced by the amount of any tax refund received by CORE post-closing. That easily could have been accomplished. The allied case, which we've cited, I submit contains very strong language about how courts should approach a commercial contract like this, negotiated by the parties. If the parties wanted to accomplish something more, in other words, to reduce the $2.4 million, the economic benefit, by the $1.76 million tax return, they could have put in a sentence to state that. But for that to be true under the text, if I'm understanding it right, you have to disregard prepaid taxes for purposes of determining what a loss is. Is that right? I mean, just the simple point would be, in order for it to be a loss, right, we've got to make a calculation. It's clear you don't take account of the tax deductions for making that I submit, Your Honor, that framing it in terms of a loss as an undefined, as the district court did, as a loss or... No, even as defined. I mean, just losses as defined. So among the things that are losses are taxes, fines, et cetera, right? Losses defined to include taxes, correct. And fines, and a whole bunch of other things. And your position seems to require that even if a fine had been paid already, or a tax had been paid already, it still is a loss because you don't look to whether it was paid, you look to whether it was assessed. And that seems kind of strange. And just to follow that out, if I adopt your position, it would seem like under the text that that would be true for every prior tax period. So go back 10 years. They paid all their taxes, but they had a tax liability. Do they owe you the full amount of taxes even though they paid them all? And I don't quite get how to distinguish that point from yours. So if you could help with that, that'd be great. Certainly. One, the definitional section of the merger agreement does define loss to include taxes. The provision that we're focused on now, Article 10, is focused specifically on losses and the 10.05 deductions. That's the core of what this case is about. The 10.05... But I'm agreeing with you on the deductions. That's not my question. So I agree with you we exclude the deductions. And now we know what the total tax liability is. What I'm trying to figure out is when a tax has been paid already, why doesn't that mean it's not a loss? In other words, the taxes that the agreement is contemplating are those taxes that were not paid as opposed to those taxes that were paid. Let me answer it two ways. First, I'd like to answer the question you asked a moment ago, why wouldn't you go back a number of years? The 10.05 deductions are particularly related to this merger. So the 10.05... My point is not about the deductions. I'm agreeing with you on the deductions. In a prior year, put aside all deductions. We've excluded all the deductions. Okay? In 2008, they had a tax liability. Presumably they paid the United States government those taxes. I assume your position is they don't owe you the amount of the tax liability precisely because the taxes were paid so there's no loss. If that's true, why isn't it equally true as to this year that you're debating about since they had a tax liability but a large amount of those taxes were paid because of the prepayment? Because, Your Honor, what this provision does, first, if there was an undischarged tax liability, they would be responsible for it 10.01. If it was discharged, though. I recognize that. What we're focusing here is solely on whether the 10.05 deductions, which only arose in the 2011 tax year, need to be offset by the tax return. And there would be no occasion to go back in time because the $6 million plus expenses that were the 10.05 deductions only happened once. And to get back to Judge Lebs' argument or question, it is this provision was carefully crafted so that in addition to the tax returns, which the parties expressly negotiated that Mercury through CORE would receive, they got something else. Let me illuminate it or illustrate it through the following hypothetical. If Section 10.01 did not exist, CORE and Mercury would have received $1.76 million as a tax refund. And that would have been true even without any of the 10.05 provisions that we've been talking about. By adding the 10.05 clause in 10.01, the parties agreed that Mercury would receive something more. And that is the financial benefit, the tax work of a loss is not supported by the language of the agreement because there's no dispute among any of the parties. And the CORE even acknowledged that there's a payment owed even if there's not an actual payment owed. So, for example, in this case, the actual payment owed was zero. When you add back the All that's true. It's just I guess I'm still asking what to do about the particular circumstance in which the tax owed has already been paid. And I just don't see where in the agreement as a textual matter we can say we just disregard the fact that the tax was already paid in part. That's different than whether we take account of the deductions or not for calculating the amount of the tax assessed. But I just don't quite get why we would also say we're not going to even look at whether the tax was already paid for purposes of whether it's a loss in the agreement. I'd like to answer that in the following ways. One, in the same manner that you could say there's nothing in the merge agreement that says you should not consider that you should not offset, there's nothing in here that says you should offset. That's point number one. Point number two is the agreement makes a clear distinction between tax liability calculated under 10.01 to exclude the 10.05 deductions and the taxes actually owed. And that makes it just more clear in the provision 10.02 that SRS relies on. Let me ask you about that if I could. I think you're arguing that KOR in actually preparing its tax returns, deciding what its tax obligation was, was entitled to factor into its tax returns all deductions that were available to it, including the deductions that are specified in this merger agreement. And by doing that, it became eligible for, it was determined that their estimated tax payments exceeded their tax obligation. Again, taking into consideration these deductions. So all of those deductions were critical to the substantial refund it got. I gather it's your position, given that those deductions were critical to the amount of the refund, that if they can now claim an offset for those Is that the argument that you're making? Precisely, Your Honor. Many of the cases, several of the cases that we've cited deal head-on with the argument of double recovery or double dipping. And in the Dominion case, I think the district court there recently in the Western District of Pennsylvania said, if sophisticated parties wanted to allow this kind of offset, they could have put it in the agreement. You read that in conjunction with decisions that say that an indemnity provision exactly like this is a purchase price adjustment. And if you look at 10.02, it draws a very clear line between tax liability calculated under 10.05, which would be 2.4 million, the hypothetical liability, if you will, and the amounts actually due on the tax return, and I'm reading from 10.05. It draws a clear dichotomy between that, and if I may just finish this sentence. The district court appeared to rely on the notion that this at bottom was only an indemnity against loss, ignoring that it was in real terms a purchase price adjustment. And on page 8 of its order, it said that the provision was really only supposed to fill a gap between the taxes paid before the closing and the taxes actually owed after the closing. It's simply incorrect, because in this case there were no taxes owed, and CORE still concedes that we're entitled to a gross amount of at least $639,000. They suggested that was a typographical error in a footnote in their brief, and I submit that if that was their position, they might have moved for reconsideration or clarification. But that was the framework within which the district court approached this case as a true indemnification rather than, I believe, the term you used was an artifact to convey a different benefit. Can I just nail down and maybe not talk about his taxes for a second just to help me clarify? Sure. Suppose there was a fine that had been assessed in this case, and that fine had not been paid. Under the agreement, I take it you would say out of the escrow account that's a loss that has to be paid to you. Correct. Okay, now suppose there was a fine that had been assessed and had been paid. Is that a loss? Just sort of yes. Okay, go ahead. It's not a loss, but we're talking about tax matters. No, no. Under the agreement, you just said fines count as losses that have to be paid. But losses don't necessarily mean taxes. And if you look at 10.01, 10.01 is dealing with taxes, not losses. So 10.01. No, but just on my hypothetical, please, just because it will help me clarify it. That's the only reason. If it was a fine that had already been paid, would it be your position under the agreement that they still have to pay you the amount of the fine? Not under 10.01. Okay. Because 10.01 and 02 are only dealing with taxes. I see, I see. I think that's an important distinction. Again, I don't want to be glib, but taxes are within the definition of losses, but not every loss is a tax. And I think this is a critical framework. Article 10 is taxes. And within the very particular confines of Article 10, we have this special negotiated treatment of the 10.05 deductions, which is a hypothetical calculation not key to an actual post-closing tax liability. It was a purchase price adjustment. And I submit that both the structure of the merger agreement and the case law that we've cited amply supports that both under the express language of the agreement, or if one were to consider whether it was appropriate to imply an offset, that the extrinsic evidence showed quite plainly that the parties under no circumstances intended what happened here. They rejected a provision which would have accomplished exactly what the district court's order does. Thank you. Thank you. May it please the Court, Roger Lane for the Appellee Shareholder Representative Services, which I'll refer to as SRS if I may. With me is my partner, Courtney Wister, and attending as well are members of our summer associate class who embrace the opportunity to see this court in operation. Mr. Lane, perhaps you could start with Mr. Carter's last point, that being that there was a provision which would have accomplished what the district court ruled, which was expressly rejected during the negotiations. Yes. I don't agree with that characterization of the issue by Mr. Carter. I will tell you what did occur. There was a proposal by a court in the negotiations that its security holders would receive the court 2011 tax refunds. Mercury did not agree to that provision, and no provision treating the refunds was ever put in the merger agreement. And so the refunds then, by operation of law, stayed with CORE, the company that Mercury acquired, and hence were taken for the benefit of Mercury. Wasn't that tax refund identified as an asset of CORE that was being purchased by Mercury? Absolutely. Absolutely. That was an asset that was purchased by Mercury. And what is critical to... So why would it have to be specified further in this agreement? Pardon? Why would it have to be specified further in the agreement? I wasn't suggesting that it was. My point was simply that this agreement has no provisions dealing with the treatment of the refund. It just carries on by operation of law. And a separate issue, a totally distinct issue, is what did the parties negotiate relative to tax indemnification in this agreement? And what they specifically negotiated was that there would be no indemnification unless there was an antecedent loss. And under Section 10.1, a loss must exist regardless of whether the tax liability is real, that is to say owed to a taxing authority, or whether the tax liability is a product of the contract, that is to say the reversal of the 2011 merger-related deductions. In either case, you have a liability. And 10.01 by its terms requires that before any indemnification obligation can arise, there must be a loss. There is no loss if the liability or to the extent the liability has been paid and therefore discharged. That's point number one. And Judge Stearns did not err in reaching that conclusion. Point two is that Section 10.02 of the agreement says that in calculating the tax indemnification for 2011, the parties are to follow the tax return, both for determining actual taxes, but also as relevant here, tax indemnification, with the only deviation being the reversal of the merger-related deductions, the so-called Section 10.05 deductions. Once that is done, you have a tax liability. But following the tax form, just as you need a loss, you take into account prepaid taxes and credits. And what 10.02 says, while one can imagine, I should add, if taxpayers didn't get credit for their tax payments, one can only imagine the tax revolt that would result. Section 10.02 merely requires that the core equity holders be treated the same way. So you run through the tax return. You calculate the income, the deductions. You flip the 10.05 deductions. You calculate the tax liability. You take into account prepayments and credits. And only then do you get to the tax liability that is due. And Section 10.02 says clearly tax indemnification is only for a tax liability that is due. So the twin requirements of a loss. Excuse me, counsel. Yes, Your Honor. Let me just read to you what I think is the relevant language for 10.02. Of course. This is the provided however clause that you're very familiar with. Yes. Provided, however, that for purposes of determining the tax liability due with respect to such tax return, and this perhaps is a critical language, for purposes of calculating the security holders indemnification obligations, the determination of the tax liability for any such pre-closing tax period will be calculated and determined excluding any deductions described in Section 10.05. Correct. What seems to be described there is a particular formula for determining the security holders indemnification obligation, which is what 10.01 is about. It seems to acknowledge that the tax liability that is spoken of there is a very particular type of calculation that is designed to determine the security holders indemnification obligation. Isn't that – how else can you – and, again, that calculation is to exclude consideration of specified deductions. I have no quarrel with any of that. It is absolutely the calculation – pardon me – that the agreement requires to determine the tax indemnification in respect of the 2011 tax year. That is to say, you follow the tax return, you flip the 10.05 deductions, you have a tax liability then. But it says what it is saying is for purposes of determining indemnification and the tax liability that is due, you calculate the liability in the following way. It does not say ignore tax prepayments. It does not say you do not need a loss. This contract requires a loss. To just, I guess, to pose to you the question I pose to opposing counsel, those estimated tax payments that were made and then refunded, they were refunded because in calculating the taxes owed, consideration was given to the very deductions which are prescribed from consideration under this provision. If that offset is applied, isn't that just a backdoor way of abrogating this provision? It is not. It is more nuanced and subtle than that because when you run the math, what you find out – and I'm finally, I think, answering your question, Judge Thompson. When you run the math, what you find out is that the refunds, when you flip the deductions, okay, and you credit the prior tax payments, there is residual amount due that is not covered by the tax prepayments. And it is that residual amount that Section 1002 captures so that it's really a very elegant provision. So that at the end of the day, what Mercury receives is exactly the value of reversing those deductions, part by a refund and part by a supplemental identification payment. That's $68,000? No, it is more like $700,000. What's the $68,000 for? So what happened was that in, I believe, August of 2012, Mercury made an initial federal tax indemnification claim that included something like $650,000 for federal taxes. SRS at that time understood that to be the Mercury federal indemnification claim for 2011. It paid it. And in doing that, Mercury did the math, and they took into account the tax prepayments and credits, which SRS thought was proper. And so they released the balance, and they thought this issue was done, okay? This case came along. Mercury asserts, no, no, no, we don't want to take those prepayments into account anymore. We rerun the math, and we find out that when you run the formula, as I have described it to you today, and there's a residual amount due, we found that the $657,000 previously released didn't quite cover all of it, okay? Another $68,000 needed to be released to cover all of it. And that's what we asked the district court to let us do. Your position doesn't depend on there being any residual amount, though. No, no, no, we released it to move the balance. No, no, no, I'm saying your position about how to construe the language, Judge Lopez, is going over with you. It happens that it looks nice that there's this residual amount so that some indemnification payment can be made. But if it was zero, because they had made an even larger prepayment, your position is exactly the same. My position is unchanged, which is that the provision is designed to ensure that they receive a particular amount of indemnification, one way or another. And the total amount that they receive is equal to reducing the deductions, looking at the tax liability. And what your position would be, that doesn't negate giving effect to the reversal of the tax deduction. It just gives effect to the fact that the taxes were paid. Correct. And Mr. Carter is correct. At the time the parties contracted, they didn't know precisely what those deductions would be, so they put in provisions to make sure they captured the whole of them. And conversely, if the parties had intended what Mercury suggests here today, there was no reason to put this alleged purchase price adjustment inside a tax indemnification regime that requires loss and reference and use of the entire tax return. They could have just put in a provision that said, pay us the 1005 deductions, period, full stop. They did not do that. They elected to craft and put this in an indemnification provision that required a loss and required a computation parallel to the complete corporate federal tax form, which invariably takes into account tax prepayments. You may be the wrong person to ask this question because I suspect I know what you're going to say, but I want to make sure that if we read it the way your opposing counsel asked it to be read, would that imply under the just plain text of the agreement that a prior tax liability for a prior tax year, even though paid in full, would be owed? That is how I understand their position because as I read their position, and Mr. Carter can certainly speak for himself, as I read their position, they are saying that for tax indemnification purposes under Article 10 of this merger agreement, if there is a tax liability, period, there is indemnification. And this agreement does not say that, and I don't know how any rational party would agree to such a thing. And I take it that the idea here is that if in addition to the reversal of the tax deductions, there was some unpaid portion of the taxes, you would agree that was owed. And we did pay it. And you would have to pay it, right, beyond. Absolutely. So then you're just saying symmetrically it should be the same, but if we did pay it, then it's not a loss and therefore not covered. Exactly. So taking the refunds into account, as Mr. Carter phrases it, or as I phrase it, taking the tax prepayments and credits into account, because that tracks the tax return, it does not abrogate the reversal of Section 1005 in any way, shape, or form. It ensures that the full value of the reversal of the 1005 deductions is delivered, but that no part of it is delivered twice. And that is a very intelligent, sensible solution the parties came to. And the fact that one could theoretically argue there is some kind of impact in the broad economic universe of this transaction, okay, because you take the prepayments into account, there's no question of that. There's just no textual basis for Mercury's position in this case. Was this merger agreement and its references to how taxes would be treated, was it specific to the 2011 tax year or did it contemplate perhaps earlier tax years as well? All of the discussion seems to be in terms of the 2011 tax year. By the terms of the agreement, was it limited to that tax year? No, no. That's just the disputed year. The way the provision is written, Tax Matters Article 10, covers any and all prior pre-closing tax years, period. And the only way it zeroes in on 2011 is that in Sections 101 and 102 it says, you know, basically it says the core equity holders have to indemnify Mercury for any tax liability that is due, any fine, any penalty that has not previously been paid that pops up after the closing. But at the time of the closing, though, were there any other tax years besides 2011 unresolved? Your Honor, there can always be an audit. I think most of the cases cited by Mr. Carter, something pops up with an audit. I mean, but my assumption would be that all tax years that could have been resolved as subject to an audit were prior to any closing, and that 2011 was the only year that was left to be dealt with. It's, to my understanding, CORE had timely filed its tax returns. Seven, eight, however many years there are remain open to audit. The way Article 10 zeroes in on 2011, to answer your question, Your Honor, is it says generally any tax liability that pops up post-closing must be paid by the former CORE equity holders. And then it just says provided, however, that the 1005 deductions shall be reversed. And then if you go to look for the definition of the 1005 deductions, those are specifically the merger-related deductions. They are defined as such. And that's the only way this entire article ties out to year 2011 specifically. Any other questions? Thank you. Thank you, Your Honors.